19-3248-cv
*New York Legal Assistance Group v. Board of Immigration Appeals*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2020

Argued: September 17, 2020     Decided: February 5, 2021

Docket No. 19-3248-cv

NEW YORK LEGAL ASSISTANCE GROUP,

*Plaintiff-Appellant,*

— v. —

BOARD OF IMMIGRATION APPEALS, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,
UNITED STATES DEPARTMENT OF JUSTICE,

*Defendants-Appellees.*

B e f o r e:

JACOBS, LYNCH, and PARK, *Circuit Judges*.

Plaintiff-Appellant New York Legal Assistance Group ("NYLAG") seeks access to non-precedential "unpublished opinions" issued by Defendant-Appellee the Board of Immigration Appeals ("BIA") in immigration cases. NYLAG wants to consult the opinions, which are not routinely made available to the public, to aid in its representation of low-income clients in removal and

asylum proceedings. NYLAG asserts that the BIA's failure to make the opinions publicly available violates the agency's affirmative obligation under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(2), to "make available for public inspection in an electronic format final opinions . . . [and] orders, made in the adjudication of cases." In this action under FOIA's remedial provision, 5 U.S.C. § 552(a)(4)(B), which authorizes district courts "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant," NYLAG seeks an order requiring the BIA to make available to the public all unpublished opinions issued since November 1, 1996, as well as future unpublished opinions. The United States District Court for the Southern District of New York (Paul A. Crotty, *J.*) dismissed the case, concluding that FOIA's remedial provision does not authorize district courts to order agencies to make records publicly available.

We conclude that FOIA's remedial provision authorizes the relief NYLAG seeks. FOIA's text, read in light of its history and purpose, empowers district courts to order agencies to comply with their affirmative disclosure obligations under 5 U.S.C. § 552(a)(2), including the obligation to make certain documents publicly available. We therefore VACATE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

Judge Park DISSENTS in a separate opinion.

---

> SCOTT L. NELSON, Public Citizen Litigation Group, Washington, D.C. (Patrick D. Llewellyn, Public Citizen Litigation Group, Washington, D.C., Danielle Tarantolo, Jane Greengold Stevens, New York Legal Assistance Group, New York, NY, *on the brief*), *for Plaintiff-Appellant.*
>
> BENJAMIN H. TORRANCE, Assistant United States Attorney, *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, NY (Arastu K. Chaudhury, Assistant United States Attorney, *on the brief*), *for Defendants-Appellees.*

William N. Lawton, Eubanks & Associates LLC, Washington, D.C., *for Amici Curiae The Animal Welfare Institute and Farm Sanctuary.*

—————————

GERARD E. LYNCH, *Circuit Judge*:

This case arises from the failure of the Board of Immigration Appeals ("BIA") to make its non-precedential opinions publicly available. Such "unpublished opinions" constitute the vast majority of the final decisions issued by the BIA each year, and are cited and relied upon by the BIA itself, by immigration judges, and by lawyers representing the government in immigration proceedings. Unpublished opinions, however, are not readily available to lawyers representing clients in immigration proceedings. New York Legal Assistance Group ("NYLAG"), a legal services provider, seeks access to the BIA's unpublished opinions to aid in its representation of low-income clients in asylum and removal proceedings.

NYLAG's request for access is based on the BIA's affirmative obligation under the Freedom of Information Act ("FOIA") to "make available for public inspection in an electronic format . . . final opinions . . . [and] orders, made in the adjudication of cases." 5 U.S.C. § 552(a)(2). Relying on that provision, NYLAG

3

asked the BIA to make publicly available in an electronic format all unpublished

opinions issued since November 1, 1996, as well as any future unpublished

opinions. The BIA denied NYLAG's request, asserting that the request was

overbroad, that the requested opinions were not "final opinions" or "orders"

under § 552(a)(2), and that, in any event, NYLAG may only request documents

on its own behalf, and may not ask that they be made publicly available.

NYLAG sought relief in federal court under FOIA's remedial provision,

which authorizes district courts to **"**to enjoin the agency from withholding

agency records and to order the production of any agency records improperly

withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). The United States

District Court for the Southern District of New York (Paul A. Crotty, *J.*) dismissed

NYLAG's complaint, concluding that FOIA's remedial provision allows district

courts to order agencies to produce documents to the complainant, but not to

make documents available to the public.

This appeal asks us to determine the scope of FOIA's remedial provision –

specifically, to decide whether it authorizes courts to enforce FOIA's affirmative

disclosure obligations by ordering that documents be made available to the

public. We conclude that it does. The text of FOIA's remedial provision and the

4

1974 amendment to it, considered in light of FOIA's history and purpose, make clear that Congress gave courts the authority to enforce an agency's obligation to make certain documents publicly available.

## BACKGROUND[1]

### I.    The Freedom of Information Act

FOIA, 5 U.S.C. § 552, originally enacted in 1966, establishes the public's right to access to government information. FOIA's first three paragraphs impose affirmative obligations on governmental agencies to disclose different categories of information in different ways. First, § 552(a)(1) requires agencies to publish certain information in the Federal Register, including descriptions of the agency's organization, rules of procedure, and substantive rules of general applicability.

Second, and most relevant here, § 552(a)(2) requires agencies to "make available for public inspection in an electronic format" certain categories of information; one such category consists of "final opinions, including concurring

---

[1] This factual background is drawn from the complaint, the allegations of which we accept as true. *See ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 492 (2d Cir. 2013).

and dissenting opinions, as well as orders, made in the adjudication of cases."[2] That provision, the so-called "reading room" provision, is the modernized version of FOIA's original requirement that agencies maintain such documents in a physical "reading room" housed in the agency and open to the public. Since 1996, agencies have instead been required to make those documents available online, in effect creating an *electronic* "reading room." Section 552(a)(2) also provides that records subject to the reading room provision may not be "relied on, used, or cited as precedent by an agency" unless they are publicly available, or the party opposing the agency has "actual and timely notice of the terms thereof."

Finally, the third obligation imposed by FOIA is the one most often litigated under the statute: under § 552(a)(3), agencies are required to make identifiable records available in response to requests from the public, subject, of course, to a number of exceptions described in § 552(b).

---

[2] Section 552(a)(2) also applies to "statements of policy and interpretations" that have not been published in the Federal Register, "administrative staff manuals and instructions to staff that affect a member of the public," and records frequently requested by the public.

FOIA also creates a private right of action in federal district court to enforce these obligations. Section 552(a)(4)(B), generally referred to as the "remedial provision," provides that:

> On complaint, the district court . . . has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant.

Finally, as relevant here, § 552(a)(6) sets forth procedures that agencies must follow when responding to requests for information from the public.

## II. NYLAG's FOIA Request

NYLAG is one of the largest providers of legal services to people in immigration proceedings in New York City. NYLAG provides low-income clients with a number of services, including direct representation in removal defense and in asylum proceedings.

The BIA, part of the Executive Office of Immigration Review ("EOIR") of the Department of Justice, is tasked with interpreting and applying immigration law. The BIA hears appeals from cases decided by immigration judges and district directors of the U.S. Department of Homeland Security.

From 2012 to 2016, the most recent years for which numbers are available

in the record, the BIA issued more than 30,000 decisions per year in individual cases. The vast majority of those decisions are "non-precedential," meaning that, although they are binding on the parties, they are not binding on future immigration courts. The BIA designates only about 30 decisions a year as precedential, and therefore binding on future immigration courts. Such a designation requires a majority vote of the active members of the BIA. 8 C.F.R. § 1003.1(g). Designated precedential decisions are available online in EOIR's electronic reading room.[3] A handful of the BIA's unpublished decisions – those that the agency has deemed frequently requested – are also available on the agency's website.[4] The balance of the BIA's unpublished decisions are not publicly available electronically.[5]

EOIR discourages, but does not prohibit, parties from citing unpublished

---

[3] *See Agency Decisions*, EOIR, https://www.justice.gov/eoir/ag-bia-decisions (last visited Nov. 12, 2020).

[4] *See Frequently Requested Records*, EOIR, https://www.justice.gov/eoir/frequently-requested-foia-records (last visited Nov. 12, 2020).

[5] NYLAG also alleges that a "small percentage"of unpublished decisions are available at the EOIR Law Library and Immigration Research Center in Falls Church, Virginia. J.A. 11.

BIA decisions in immigration proceedings.[6] Nevertheless, immigration judges

and lawyers representing the government cite unpublished decisions in

immigration proceedings.[7] Moreover, despite the BIA's contention that it

"discourages parties from citing" these opinions, Appellees' Br. 17 n.3, the BIA

itself has cited them in its decisions.[8]

_____

[6] *See* Board of Immigration Appeals Practice Manual, EOIR, 61 (2020), https://www.justice.gov/eoir/page/file/1324276/download ("Citation to non-precedent Board cases by parties not bound by the decision is discouraged."); Immigration Court Practice Manual, EOIR, Appendix J-3 (2020), https://www.justice.gov/eoir/page/file/1258536/download ("Citation to unpublished decisions is discouraged because these decisions are not binding on the Immigration Court in other cases.").

[7] *See, e.g., In re Stewart*, 2016 WL 4035746, at *1 (B.I.A. June 30, 2016) ("In its motion, the Government sought remand for the Board to determine the effect on the respondent's removability [of] . . . the Board's decision in an unpublished case[.]"); *In re Iqbal*, 2007 WL 2074540, at *3 (B.I.A. June 19, 2007) ("[T]he Immigration Judge declined to find that the respondent had knowingly committed marriage fraud . . . . The DHS urges us to find otherwise based on an unpublished case."); *In re Perez-Herrera*, 2018 WL 4611455, at *6 (B.I.A. Aug. 20, 2018) ("The Immigration Judge considered the relevant jury instructions, Pennsylvania state court cases, and unpublished Board decisions . . . ."); *In re Bayoh*, 2018 WL 4002292, at *1 n.1 (B.I.A. June 29, 2018) ("The Immigration Judge's decision specifically referenced and attached . . . two Board unpublished decisions . . . .").

[8] *See, e.g., In re Razo*, 2017 WL 7660432, at *1 n.1 (B.I.A. Oct. 16, 2017) ("We separately note that in an unpublished decision issued after the Immigration Judge's decision in these proceedings, the Board found that solicitation of prostitution under a Florida criminal statute is a CIMT."). In addition, the BIA

NYLAG seeks access to unpublished BIA decisions so that it can use them in representing clients in immigration proceedings. On June 8, 2018, NYLAG requested, pursuant to § 552(a)(2), that the BIA make publicly available in electronic form all unpublished BIA decisions issued after November 1, 1996. NYLAG also requested that the BIA make publicly available all future unpublished decisions. On July 13, EOIR responded to NYLAG's request by email, stating that the request was overbroad. EOIR also informed NYLAG that it had begun a process of reviewing and releasing to FOIA requesters unpublished BIA decisions from October 2015 through 2017. EOIR offered to expeditiously provide the already-reviewed decisions to NYLAG, along with future unpublished decisions after they had been reviewed, if NYLAG would agree to narrow its request to include only those decisions. NYLAG responded by email on July 17, explaining that it was not willing to narrow its request, and that it was requesting that EOIR make these documents electronically available to the public, pursuant to § 552(a)(2), rather than asking EOIR to produce them directly to

has referenced non-precedential opinions cited by respondents in immigration proceedings, indicating the utility to litigants of such opinions when they have had access to them. *See, e.g.*, *In re Alvarez Fernandez*, 2014 WL 4966372, at *2 (B.I.A. Sept. 23, 2014) ("[T]he respondent submitted an unpublished decision . . . . Although this decision is not precedential, we adopt a similar analysis . . . .").

NYLAG. NYLAG also offered to work with the agency to establish a reasonable timeline for complying with the request.

On August 8, 2018, EOIR formally denied NYLAG's request by letter. EOIR contended that unpublished BIA opinions are not "final opinions" or "orders" within the meaning of § 552(a)(2). EOIR also contended that the only remedy available when an agency fails to post records under § 552(a)(2) is for the party seeking the records to request them under § 552(a)(3). Finally, EOIR again asserted that NYLAG's request was overbroad.

On September 10, 2018, NYLAG appealed the denial of its request to the Office of Information Policy ("OIP") at the Department of Justice. NYLAG asserted that EOIR was required to publicly post in an electronic reading room all BIA opinions, including unpublished opinions, because they meet the definition of "final opinions . . . [and] orders, made in the adjudication of cases" under § 552(a)(2). NYLAG also contended that § 552(a)(2) empowers individuals and organizations to request the public posting of records.

## III. Proceedings in the District Court

On October 17, 2018, after OIP's statutory deadline to respond to the

appeal had passed,[9] NYLAG filed suit in the Southern District of New York against the BIA, EOIR, and the Department of Justice (hereafter, collectively "the BIA") pursuant to § 552(a)(4)(B), contesting the denial of its request. In the alternative, NYLAG sought relief under the APA. The BIA moved to dismiss the case under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), arguing that FOIA's remedial provision does not authorize district courts to grant the relief NYLAG seeks. Both parties also moved for summary judgment.

On August 13, 2019, the district court granted the BIA's motion to dismiss. Citing a D.C. Circuit decision, *Citizens for Responsibility & Ethics in Washington v. United States Dep't of Justice*, 846 F.3d 1235 (D.C. Cir. 2017) ("*CREW I*"), the court concluded that "[w]hile the BIA may have an obligation to make available for public inspection certain opinions, this court only has jurisdiction to order the production of documents to the complainant." J.A. 60 (citations omitted). The district court explained that it read FOIA's remedial provision – authorizing the court "to enjoin the agency from withholding agency records and to order the

---

[9] Absent "unusual circumstances," OIP had 20 business days to respond to NYLAG's administrative appeal; if it failed to act within that period, NYLAG could file suit in district court without further delay. 5 U.S.C. § 552(a)(6)(A). On February 19, 2019, OIP formally denied NYLAG's administrative appeal.

production of any agency records improperly withheld from the complainant" –

as a whole, such that "from the complainant" modifies the entire provision and

authorizes the court to order production only to the complainant. The court

further observed that even if the two clauses in the provision are read

individually, "[t]he use of the term 'withholding' [in the first half] suggests, in

the context of the statute, that the records were withheld from a complainant."

J.A. 63.

Because the district court concluded that it did not have the authority to

order the remedy NYLAG sought, it did not decide whether the BIA's

unpublished opinions were "final opinions, including concurring and dissenting

opinions, as well as orders, made in the adjudication of cases" within the

meaning of § 552(a)(2), or whether ordering the BIA to make its unpublished

decisions publicly available would unduly burden the BIA.[10] The district court

---

[10] The parties contested both of these questions below, but did not address them on appeal. We assume for the purposes of this appeal, without deciding, that the BIA's unpublished opinions are subject to disclosure under § 552(a)(2), and leave that question for the district court to address in the first instance. Similarly, we leave the question of undue burden for the district court to address, should it conclude that relief is necessary. *See Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 90 (2d Cir. 2004) ("In general, we refrain from analyzing issues not decided below . . . .").

13

also denied NYLAG's request for relief under APA § 704, which authorizes courts to provide a remedy only when "there is no other adequate remedy." 5 U.S.C. § 704. The court concluded that because "FOIA provides an alternative, adequate remedy," namely the production of documents to the complainant rather than to the public, NYLAG's APA claim was without merit. J.A. 64.[11]

The district court dismissed the complaint. This appeal followed.

## DISCUSSION

We review the grant of a motion to dismiss *de novo*, "accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) (internal quotation marks omitted).[12] The subject of our analysis is the question decided by

---

[11] NYLAG contests this conclusion on appeal, *see* Appellant's Br. 46, but because we conclude that FOIA does authorize the remedy NYLAG seeks, we need not address the availability of relief under the APA.

[12] It is not clear whether the district court granted the BIA's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6). *See* J.A. 58-59 (providing the legal standard for both provisions). Although our standard of review is the same under either provision, we note that this motion was properly addressed under Rule 12(b)(6). As we explained in *Main Street Legal Services, Inc. v. National Security Council*, courts should "construe § 552(a)(4)(B) to reference remedial power, not subject-matter jurisdiction" because its "language does not speak to the court's ability to adjudicate a claim, but only to the remedies that the court may award." 811 F.3d 542, 566 (2d Cir. 2016); *see also id.* (explaining that

the district court: what relief does FOIA's remedial provision empower district courts to order? Before reaching that question, we canvass the decisions of other circuits on the same point and consider whether they offer helpful guidance.

## I. Decisions of Other Circuits

The question before us on appeal is one that has divided our sister circuits. The district court relied heavily on the D.C. Circuit's decision in *CREW I* to support its restrictive interpretation of FOIA's remedial provision and the BIA urges us to do the same on appeal. NYLAG refers us to *Animal Legal Defense Fund v. USDA*, 935 F.3d 858 (9th Cir. 2019) ("*ALDF*"), decided after the decision below, in which the Ninth Circuit reached the opposition conclusion, holding that FOIA empowers district courts to order agencies to make records available for public inspection. We consider each decision in turn.

In *CREW I*, the D.C. Circuit considered whether a district court could compel the Department of Justice's Office of Legal Counsel ("OLC"), which provides legal advice to the executive branch, to comply with FOIA's reading room provision by making electronically available existing and future OLC

references to "jurisdiction" with regard to this provision in previous cases also refer to remedial power).

15

opinions. 846 F.3d at 1239. The court concluded that FOIA's remedial provision authorizes district courts to enter an injunction "requir[ing] disclosure of documents and indices only to [the plaintiff], not disclosure to the public." *Id.* at 1244.[13]

While we appreciate the D.C. Circuit's analysis in *CREW I*, we do not find it persuasive for a number of reasons. First, both parties to the case "narrowly construe[d] FOIA's remedial provision," assuming that, on its face, the text does not permit the court to order that documents be made available for public inspection. *Id.* at 1241. Consequently, the court spent little time parsing the text of the statute, and instead proceeded directly to considering whether courts had equitable authority to order the remedy CREW sought. *Id.* As described below, however, we find that the text of FOIA's remedial provision does support the position that courts may order the relief sought here. Therefore, we need not rely on the equitable power the D.C. Circuit rejected.

Moreover, the court in *CREW I* clearly considered itself bound by its prior

---

[13] Because CREW sought relief under the APA, the ultimate question the court addressed, which it decided in the affirmative, was whether FOIA's remedial provision provided an "adequate remedy" such that review under the APA was precluded. *Id.* at 1246 (quoting 5 U.S.C. § 704).

decision in *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191 (D.C. Cir. 1996), in which the D.C. Circuit held that courts do not have the power to order agencies to publish documents in the Federal Register, as required by § 552(a)(1). *See CREW I*, 846 F.3d at 1243 ("Given *Kennecott*'s construction of section 552(a)(4)(B), we think it clear that a court has no authority under FOIA to issue an injunction mandating that an agency 'make available for public inspection' documents subject to the reading-room provision.").[14] We, of course, are not bound by that precedent.

Finally, the D.C. Circuit itself appears to have reservations about the interpretation of the remedial provision expressed in *CREW I*. In a second case involving the same parties, the plaintiff sought the same relief under FOIA that

---

[14] The dissent argues that *Kennecott*'s analysis contains the careful parsing of the text that *CREW I* lacks. That is, to some extent, true. However, *Kennecott* was addressing a request for publication to the Federal Register under § 552(a)(1). 88 F.3d at 1202-03. Accordingly, much of the analysis in that decision turns on whether "production" in § 552(a)(4) encompasses "publication" to the Federal Register as required by § 552(a)(1). *Id.* at 1203. Although we agree that the district court's authority to provide a remedy is likely to be the same as to both provisions, we note that § 552(a)(2) does not command "publication"; instead, it commands that the agency "make available for public inspection in an electronic format" the relevant documents. Accordingly, the D.C. Circuit's interpretation of whether "production" encompasses "publication" is not directly relevant to the question before us.

17

the court had earlier denied under the APA. *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice (CREW II)*, 922 F.3d 480 (D.C. Cir. 2019). In that case, the D.C. Circuit construed *CREW I* narrowly as turning on the fact that the plaintiff "improperly brought its claim under the Administrative Procedure Act, 5 U.S.C. § 704, instead of FOIA's judicial-review provision." *Id.* at 485.[15]

For all of these reasons, we decline to follow the D.C. Circuit's decision in *CREW I*. We turn next to the Ninth Circuit's decision in *ALDF*, which we find more persuasive.

In *ALDF*, plaintiffs, animal rights organizations, sought access to facility inspection reports, warning letters, administrative complaints, and other documents generated by the Animal Plant Health Inspection Service ("APHIS") in its implementation of the Animal Welfare Act. 935 F.3d at 863-64. These documents were previously available in APHIS's electronic reading room and labeled as "frequently requested." *Id.* at 864. In 2017, APHIS removed these

---

[15] Ultimately, the court in *CREW II* again dismissed CREW's complaint, ruling that CREW had not adequately alleged that the requested OLC opinions had been adopted by the agencies to which they were addressed, while noting that records are "withheld" by the failure to comply with the reading room requirement. *Id.* at 486. Judge Pillard, dissenting, would have held that the complaint stated a claim for relief. *Id.* at 490-94.

records from its electronic reading room and announced that it would no longer be making them publicly available. *Id.* Plaintiffs filed suit, seeking to compel APHIS to restore the documents, and to continue posting them. *Id.* at 865.

The Ninth Circuit concluded that the remedy plaintiffs sought was authorized by FOIA's remedial provision.[16] The court began with the text of the provision and concluded that the words "mean what they say: FOIA authorizes district courts to stop the agency from holding back records it has a duty to make available" and order them to be made publicly available. *Id.* at 869. The court also noted that if the provision allowed courts to order the production of documents only to the complainant, "then the judicial-review provision would not need the words 'jurisdiction to enjoin the agency from withholding agency records,'" which would be superfluous. *Id.* at 870. The court turned next to the structure of FOIA, and relied on the fact that Congress made clear that the judicial review provision applies to all three parts of § 552(a). *Id.* at 871. The court concluded that it would make little sense if the only remedy for documents withheld under § 552(a)(2) was the same as that for documents withheld under § 552(a)(3), the request provision. *Id.* at 872. We find a number of these points persuasive and

---

[16] Judge Callahan dissented. *Id*. at 877-78.

19

adopt them in our own analysis, as set forth below.

But while the opinions of the other circuits that have addressed the issue are in many respects enlightening, in the end, they do not reflect a consensus. Rather, both circuits that have ruled, in apparently divergent ways, on the question before us appear divided, and their rulings are in any event not binding on us. Accordingly, we undertake our own independent analysis of the proper interpretation of FOIA's remedial provision. Based on that analysis, we conclude that the text, the context, the historical evolution, and the purpose of that provision all support the conclusion that Congress has authorized courts to order agencies to comply with the obligations Congress imposed on them in § 552(a)(2).

## II.    FOIA's Remedial Provision

The provision at issue in this appeal authorizes courts "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). An agency withholds records "improperly" when it fails to comply with FOIA's "mandatory disclosure requirements" in § 552(a)(2), *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 150 (1989), and the parties agree that FOIA's remedial provision is clear on its face that it can be used to remedy an agency's

failure to comply with § 552(a)(2).

The parties disagree, however, about the scope of relief available. NYLAG argues that the court may order relief that aligns with the affirmative obligation described in each paragraph of § 552(a), meaning that to remedy a failure to comply with § 552(a)(2), the court may order that documents be posted to an electronic reading room. The BIA contends that the relief available is more limited, and that a court can only order the production of the missing documents to the individual seeking those documents.

*A. Text*

"Every exercise in statutory construction must begin with the words of the text." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003). The words of the text to be interpreted are not considered alone, however. Instead, we "look[ ] to the statutory scheme as a whole and plac[e] the particular provision within the context of that statute." *Id.* If the text of the statute "is not entirely clear, we then turn to the broader statutory context and its history." *Khalid v. Sessions*, 904 F.3d 129, 132 (2d Cir. 2018).

The district court concluded, apparently with little difficulty, that the text of § 552(a)(4)(B) must be read as according with the BIA's position that courts

21

may order an agency to produce documents only to the complainant rather than the general public. The court read the provision as authorizing only a single form of relief (in effect, "to enjoin and to order") – with the second verb simply defining and limiting the first. In other words, Congress authorized courts to remedy violations of any provision of FOIA, including that requiring that documents be made available to the general public, only by ordering the production of the withheld documents to the complainant.

NYLAG contends, however, that the remedial provision's text should be read as containing two separate clauses: first, the district court has authority "to enjoin the agency from withholding agency records," and second, the court is further empowered "to order the production of any agency records improperly withheld from the complainant." § 552(a)(4)(B). According to NYLAG, the use of the conjunctive "and" in this provision means that Congress gave the courts *both* the power to "enjoin the agency from withholding" records *and* the power to "order the production" of records.[17] NYLAG argues that the BIA is improperly

_____

[17] NYLAG further argues that even this second provision is not limited to ordering the production of documents only to the complainant, because a district court could order the production of documents to an electronic reading room. Appellant's Br. 25-26.

withholding unpublished decisions, and seeks an order "enjoin[ing]" the agency from continuing to withhold those records from public inspection as required by § 552(a)(2). NYLAG further argues that interpreting this provision to mean that Congress *withheld* from courts the authority to enjoin agencies from violating the reading room provision would be directly contrary to the statutory text. *See ALDF*, 935 F.3d at 869; *see also Animal Welfare Inst. v. U.S. Dep't of Agric.*, No. 6:18-CV-06626-MAT, 2019 WL 3083025, at *6 (W.D.N.Y. July 15, 2019) ("[A] plain reading of this section seems to suggest that a district court has both the authority to enjoin the agency from withholding records (i.e., injunctive relief), and to order the production of any agency records withheld from a particular plaintiff, which would appear to cover the reading room provision.").

In contrast, the BIA argues that the text of FOIA's remedial provision should be read so that the final clause ("improperly withheld from the complainant") modifies the entire provision.[18] Accordingly, the BIA contends, if a

---

[18] The BIA also asserts that allowing the court to order the documents to be produced for public inspection would allow NYLAG to impermissibly seek relief for a "generally available grievance . . . suffered equally by all members of the public." Appellees' Br. 15, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573-74 (1992). But here, there can be no dispute that NYLAG has raised an individual injury that is concrete and particularized: it alleges that "[t]he agency's failure to make unpublished BIA decisions publicly available . . . impair[s] NYLAG's

23

district court concludes that the agency has improperly withheld records, it may order that those records produced only *to the complainant*, not the general public.

Although neither parties' reading is "wholly without force," *United States v. Epskamp*, 832 F.3d 154, 162 (2d Cir. 2016), we find NYLAG's position more persuasive. On one hand, the phrase "to the complainant" appears somewhat redundant if it is not read to limit the court's power. However, "a coordinating junction like 'and'" is typically used for "linking independent ideas," *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 236 (2011), suggesting that Congress meant to authorize courts to exercise two independent powers, only the second of which would be modified by the phrase "to the complainant."

Moreover, the syntax of the provision belies the BIA's argument. The conjunction "and" links two infinitives: "to enjoin" and "to order." The phrase "from the complainant" appears in the phrase governed by the latter infinitive. If it were intended to modify "withholding" in the phrase governed by "to enjoin"

---

ability to represent clients in immigration proceedings." Appellant's Br. 10. This type of injury has been found to satisfy the constitutional requirements of standing. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) ("[A] plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute."). It is not shared by all members of the public who are aggrieved in a general way by the BIA's failure to comply with FOIA's requirements.

as well as "withheld" in the second phrase governed by "to order," that intention would have to be expressed by adding commas after "records" in the first infinitive phrase and "withheld" in the second, in order to take the words "from the complainant" out of the second infinitive phrase. *Cf. Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 781-82 (2d Cir. 2013) (explaining that "[w]hen there is no comma . . . the subsequent modifier is ordinarily understood to apply only to its last antecedent").

Imagining the provision punctuated in that way, however, only emphasizes how stilted and unnatural the BIA's reading of the text is. If Congress intended the interpretation that the BIA proposes, it would be far more natural to draft the provision as: "to enjoin the agency from withholding agency records *from the complainant,* and to order the production of any agency records improperly *so withheld.*" While both parties' readings are *possible*, NYLAG's interpretation seems to us by a good measure the more natural meaning of the language chosen by Congress.

The parties' subsidiary arguments do nothing to alter that conclusion. First, both parties turn to the canon against superfluity, each arguing that its opponent's reading violates the "cardinal rule" that "instructs courts to interpret

25

a statute to effectuate all its provisions, so that no part is rendered superfluous."

*Hibbs v. Winn*, 542 U.S. 88, 89 (2004). NYLAG asserts that the BIA's reading would render the first clause, granting courts the authority to "enjoin the agency from withholding agency records" superfluous, since the first provision would merely duplicate the relief authorized by the second clause. The BIA, in turn, argues that NYLAG's reading also creates superfluity – if the first clause in the provision allows a court to grant broad relief, the relief in the second clause, allowing the court to order production of documents to the complainant, would be subsumed in the first. To some extent, therefore, the parties' respective arguments from the canon against superfluity cancel each other out.[19]

---

[19] The mutual arguments from superfluity here illustrate the point that the Supreme Court has made concerning the limited force of arguments from superfluity: Congress not infrequently uses arguably redundant language in order to emphasize the breadth of its meaning and avoid creating loopholes in statutes. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013) (phrase alleged to be redundant "would not be superfluous if Congress included it to remove doubt"). Accordingly, "the canon against surplusage 'assists only where a competing interpretation gives effect to every clause and word of a statute,'" and should not be determinative where "no interpretation of [the statute] gives effect to every word," as is the case here. *Id.* at 385, quoting *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 106 (2011). For that reason, we disagree with the dissent's somewhat strained assertion, advanced without supporting authority, that the BIA's redundant interpretation is inherently better because it renders the broader clause redundant rather than the narrower one. *See* Dissent at 6-7.

NYLAG offers a variant on the superfluity argument that, at least in a marginal way, cuts in its favor. As NYLAG points out, courts often apply the rule that a word is known by the company it keeps in order to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995) (interpreting "communication" narrowly so as not to render "'notice, circular, advertisement, and letter' redundant") (internal alterations omitted). Here, that rule suggests that the first clause is best read as providing a remedy distinct from that authorized by the second clause. *See ALDF*, 935 F.3d at 870. Though this argument has at least some merit, in the end we think that the arguments from superfluity on both sides add little or nothing to the textual analysis above.

Second, the parties dispute the meaning of the word "withholding" in the context of the provision. The BIA argues that, in context, the use of the word "'withholding' suggests . . . that the records were withheld from a complainant." Appellee Br. 13 (quoting the district court's decision on the same point). The BIA also notes that elsewhere in the statute, the term "withholding" "is linked to a request for information rather than generally failing to making documents available to the public." Appellees' Br. 13, citing § 552(a)(4)(F)(i) and § 552(d). The

27

BIA contends that the proper remedy, therefore, is to make the documents available to the complainant, not the public.[20]

However, it is entirely natural to say that an agency "withholds" documents when it fails to publish them in violation of a direct statutory command that they be published in a manner accessible to the public. The definition of "withhold" is "to hold back from action." Appellant's Br. 25, citing The Merriam-Webster.com Dictionary (last visited December 2, 2020), https://www.merriam-webster.com/dictionary/withhold.[21] Applying that

---

[20] The BIA also relies on *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1 (1974), for the proposition that FOIA's remedial provision authorizes district courts "to grant injunctive relief of a described type, namely, 'to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant.'" 415 U.S. at 18. That argument overreads a particular remark by ignoring the context in which it was made. The Court in *Bannercraft* rejected the idea that the remedies authorized by FOIA are exclusive, notwithstanding the usual rule that the provision of a specific remedy implies exclusivity. Instead, it held that the grant of equity power in the statute is broad, concluding "there is little [in the text of FOIA] to suggest, despite the Act's primary purpose, that Congress sought to limit the inherent powers of an equity court." *Id.* at 19-20; *accord, CREW I*, 846 F.3d at 1241-42. Properly read, *Bannercraft* does not directly address the issue in this case, and supports an expansive rather than restricted view of the remedies available to a FOIA plaintiff.

[21] To the extent it matters, the meaning of "withhold" has not changed materially since the period when FOIA was first enacted. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2627 (1971 ed.) (defining "withhold" as "to hold

definition, NYLAG argues that an agency "withholds" records when it "holds

back from" publicly posting those records. Appellant Br. 25; *see also ALDF*, 935

F.3d at 869. We find NYLAG's argument persuasive. At a minimum, the BIA's

argument is insufficient to overcome our basic conclusion regarding the better

understanding of the text.

In short, although neither party's interpretation of FOIA's remedial

provision is entirely implausible, NYLAG's position is clearly the more

persuasive one.

*B. Context*

We turn next to the broader context of the contested provision. The

structure of the statutory scheme in which the remedial provision is embedded

reinforces our conclusion regarding its proper interpretation. Although each

party's structural argument has some merit, the structure of the statute on

balance clearly provides stronger support to NYLAG's position.

The BIA begins by pointing out that the statute lays out administrative

procedures and deadlines that an agency must follow in responding to "any

request for records made under paragraph (1), (2), or (3)" of § 552(a). 5 U.S.C

---

back[, ]keep from action").

§ 552(a)(6)(c)(1). Under those procedures, "[u]pon any determination by an agency to comply with a request for records," the records must be "made promptly available" to the "person making [the] request." *Id.* That provision suggests that Congress anticipated that an agency would respond to a request by producing documents to the requester, regardless of the paragraph under which the request was made – although NYLAG not unreasonably points out that an agency could make the records available to a requester by making them conveniently available to the public.

Similarly, under § 552(a)(4)(F), when a district court "orders the production of any agency records improperly withheld from the complainant" it may also refer the agency to the Office of Special Counsel to investigate whether agency personnel acted arbitrarily and capriciously in withholding the documents. The BIA argues that this provision implies that Congress anticipated that the *only* relief a court could order would be production of documents to the complainant. That overstates the case, however. Section 552(a)(4)(F) *expressly* limits the authority to refer agency personnel for investigation to situations in which documents are withheld "from the complainant." While there is no obvious reason why Congress would limit that remedy to some violations of FOIA but

not to others, the express limitation of the Special Counsel investigation to one particular context does not foreclose the possibility of other remedies. Moreover, the argument leads directly back to the question of whether an agency withholds documents – from the complainant as well as from others – when such documents are not published in the manner that Congress specifically required the agency to do. Accordingly, the Special Counsel provision casts little light on our problem.

With respect to § 552(a)(6), NYLAG highlights that the provision specifies that it applies to requests made "under paragraph (1), (2), or (3)" of § 552(a) and states that if the agency denies the request, it must "notify the person making such request of the provisions for judicial review." 5 U.S.C § 552(a)(6)(A). That provision confirms that the judicial review provision applies to violations of § 552(a)(2). But as noted above, the BIA argues not that such violations are unreviewable, but rather that publication is not an available remedy when the agency is found to have violated that obligation.

Somewhat more persuasively, NYLAG points out that the judicial review provision states that courts, in determining the scope of relief, must "accord substantial weight to an affidavit of an agency concerning the agency's

31

determination as to technical feasibility under paragraph (2)(C)." 5 U.S.C. § 552(a)(4)(B). That clause refers to an affidavit concerning the feasibility of indicating the extent of a deletion from staff manuals and instructions to staff made publicly available under paragraph 2(C), which, according to NYLAG, shows that Congress anticipated that courts could order agencies to make documents available for public inspection under the judicial review provision – otherwise, the question of technical feasibility would have little relevance. NYLAG is correct that the provision suggests that Congress apparently contemplated judicial orders to agencies to comply with the obligations imposed by provisions other than § 552(a)(3).

Even more persuasively, NYLAG argues that reading the statute as the BIA proposes, such that the only remedy available when an agency fails to provide records under §§ 552(a)(1) or (a)(2) duplicates the relief that the complainant would have gotten had it instead requested copies of those records under § 552(a)(3), would render the proactive disclosure requirements in the first two paragraphs merely precatory. *See also ALDF*, 935 F.3d at 872.

The BIA responds that its reading does not render the disclosure requirements toothless, because the proactive disclosure requirements contain

their own enforcement mechanisms. Specifically, under § 552(a)(1), a person may not be "adversely affected by" any matter that is required to be published in the Federal Register if it has not been published, unless she has received "actual and timely notice" of its terms. Similarly, under § 552(a)(2), an agency may not rely on, cite as precedent, or use any unpublished "final order, opinion, statement of policy, interpretation, or staff manual or instruction" against any party unless that party has received "actual and timely notice" of its terms. In other words, the BIA argues that the proactive disclosure provisions are self-enforcing, because there is a consequence for the agency inherent in failing to comply with the provisions: it must ensure that any party it seeks to use the materials against has accurate and timely notice of those materials.

Although "we recognize that the last sentence in paragraph (2) does contain a sanction, . . . we feel it was not meant to be an exclusive one." *Am. Mail Line, Ltd. v. Gulick*, 411 F.2d 696, 701 (D.C. Cir. 1969). First, the "sanction" within § 552(a)(2) does not ensure compliance with Congress's command that the agency make available *all* final decisions, because the BIA can easily give notice of any unpublished decision that it seeks to use in litigation without providing the opposing party with its many other, potentially relevant, unpublished

33

decisions.[22] What's more, given that both parties agree that Congress intended courts to review agencies' compliance with the affirmative obligations in § 552(a)(2), *supra* p. 20, it makes little sense to suggest that the remedy for failing to comply with those obligations is limited to the one embodied in the provision itself, which operates outside the scope of that judicial review. All of these considerations confirm our conclusion that NYLAG's position is the more persuasive one.

*C. Statutory Evolution*

We next turn to the evolution of the text, and in particular to the 1974 amendment to FOIA's remedial provision. NYLAG asserts that this, too, supports its interpretation. We agree.

We begin by noting that the "record of *enacted* changes Congress made to

---

[22] For the same reason, the dissent's citations to *Kennecott*, 88 F.3d 1191, and *Northern California Power Agency v. Morton*, 396 F. Supp. 1187, 1191, 1195 (D.D.C. 1975), *see* Dissent at 13, are not persuasive. Those cases dealt with an agency that would be prevented from enforcing a *rule* that it failed to publish under § 552(a)(1), unless it gave actual and timely notice of the rule to the opposing party. The sanction of requiring the agency to give notice of material on which it wishes to rely is materially less effective when the unpublished material is a body of precedent that can be selectively disclosed to the agency's advantage than when it is a rule that must be disclosed in its entirety when the agency wishes to enforce it.

the relevant statutory text over time[ is] the sort of textual evidence everyone agrees can sometimes shed light on meaning." *BNSF Ry. Co. v. Loos*, 139 S. Ct. 893, 906 (2019) (Gorsuch, J., dissenting) (emphasis in original).[23] "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995). We may not adopt a "narrow[] application" of such an amendment if it will render Congress's efforts "an exercise in futility." *Pierce Cty., Wash. v. Guillen*, 537 U.S. 129, 145 (2003).

The remedial provision of FOIA was amended in 1974, as part of a package of amendments to the statute. Originally, the remedial provision appeared in § 552(a)(3), along with the provision permitting the public to request documents. It read:

> Except with respect to the records made available under
> paragraphs (1) and (2) of this subsection, each agency,
> on request for identifiable records . . . shall make the
> records promptly available to any person. On

---

[23] Courts routinely give substantial weight to statutory history of amendment when interpreting the text of a statute. *See, e.g., Hinck v. United States*, 550 U.S. 501, 503-07 (2007); *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 258 (2004); *Booth v. Churner*, 532 U.S. 731, 739-41 (2001); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 256 (2012) ("If the legislature amends or reenacts a provision other than by way of a consolidating statute or restyling project, a significant change in language is presumed to entail a change in meaning.").

complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant.

5 U.S.C. § 552(a)(3) (1970). The placement of the judicial review authority in the provision of the statute creating the right of individual members of the public to request access to particular documents strongly suggested that the authorization of judicial enforcement applied only to that provision of FOIA.

The 1974 amendment to the remedial provision retained the same wording – beginning with "[o]n complaint . . ." – but moved the provision to a separate section, § 552(a)(4)(B). The Senate Judiciary Committee Report explained that "the original intent of Congress in enacting subsection (a)(3) [was] that the judicial review provisions apply to requests for information under subsections (a)(1) and (a)(2) of section 552, as well as under subsection (a)(3)." S. Rep. No. 93-854 (1974), at 9, *reprinted in* H.R. Comm. on Gov't Operations & S. Comm. on the Judiciary, 94th Cong., *Freedom of Information Act and Amendments of 1974 (P.L. 93-502) Source Book*, at 161 (1975). The Report went on to explain that a change to the remedial provision was necessary because "[o]n occasion, the Department of

Justice has argued in litigation that judicial review of a denial of information requested under subsections (a)(1) and (a)(2) was not available under the FOIA." *Id.* The Report noted that "courts have uniformly rejected this argument" and explained that the "restructuring of subsection (a)(3) should lay this issue to rest, making it clear that de novo judicial review is available to challenge agency withholding under any provision in section 552." *Id.*[24]

We place little, if any, weight on the Senate Report's retrospective reflection on the original intent of the Congress that enacted FOIA in 1966. But its account of the intent behind the 1974 amendment itself is persuasive, because it corresponds to the very change being made in the structure of the statute by that amendment. Whether the amendment merely corrected an unintended glitch in the original language or effected a change, there can be little doubt that by relocating the judicial review provision Congress amended FOIA to make clear that judicial review is available when an agency fails to comply with *any*

---

[24] The Senate Report also cited with approval *American Mail Line, Ltd. v. Gulick*, 411 F.2d 696. In that case, the D.C. Circuit noted that "Congressional intent . . . seems to have been that judicial review would be available for a violation of any part of the Act" and concluded that the document in question in that case, a memo documenting a decision adverse to a private party, was "being improperly withheld by the Government and must be ordered to be produced for *public inspection* by our district court." *Id.* at 701-702 (emphasis added).

provision of § 552(a).

The BIA argues that its interpretation gives effect to this amendment by allowing members of the public to seek judicial review when documents are withheld under §§ 552(a)(1) and (a)(2), even though they must be content with the remedy of receiving those withheld documents personally. But "[t]hat reading gives the amendment no 'real and substantial effect' and, accordingly, cannot be the proper understanding of the statute." *Pierce Cty., Wash.*, 537 U.S. at 145, quoting *Stone*, 514 U.S. at 397.[25]

If the only remedy available in a lawsuit for violation of §§ 552(a)(1) or (a)(2) is that the district court can order the agency to produce the documents to the complainant, then Congress would not have needed to clarify that judicial review was available for violations of all three subsections. Under the original formulation, a member of the public could request any "identifiable record"

---

[25] The dissent contends that our interpretation "is not only novel, but contrary to FOIA's history," relying on the fact that only one other circuit court has interpreted FOIA's remedial provision as we do here, and that one only recently. Dissent at 16. But that argument ignores the paucity of authority on either side of the question. With the exception of the D.C. Circuit's decision in *CREW I* (decided in 2017), which drew on its interpretation in *Kennecott* (decided in 1996), the dissent points to no body of authority since 1974 supporting its interpretation of the remedial provision.

under § 552(a)(3), "[e]xcept . . . records *made available* under paragraphs (1) and (2)." 5 U.S.C. § 552(a)(3) (1970) (emphasis added). In other words, members of the public could already seek identifiable documents not made available under §§ 552(a)(1) and (a)(2) (i.e., documents required to be published by those subsections but improperly withheld) by making a request under § 552(a)(3), and pursuing judicial enforcement of that request if the agency denied it.

But Congress was not satisfied with that approach, and amended the statute to clarify that judicial review was available for violations of §§ 552(a)(1) and (a)(2) as well. Giving that amendment "real and substantial effect," *Stone*, 514 U.S. at 397, and considering it in light of the remedial provision's text and the structure of FOIA, requires us to conclude that Congress intended to give district courts the authority to order agencies to make documents available for public inspection when they fail to comply with their affirmative obligations in § 552(a)(2).

*D. Purpose*

A broad reading of FOIA's remedial provision is also consistent with the statute's purpose. FOIA "was enacted to facilitate public access to Government documents." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991), citing *John Doe*

39

*Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989). It "was designed 'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" *Id.*, quoting *Dep't. of Air Force v. Rose*, 425 U.S. 352, 361 (1976). "The affirmative portion of the Act . . . represents a strong congressional aversion to secret (agency) law." *N. L. R. B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975) (internal quotation marks omitted). Moreover, as the Supreme Court has "repeatedly stated[,] . . . [t]he policy of the Act requires that the disclosure requirements be construed broadly." *Dep't of Air Force*, 425 U.S. at 366 (internal citation omitted).

Here, the BIA asks us to acquiesce to just such a system of "secret agency law" that systematically limits the access to information of parties opposing the government in immigration proceedings. It may be that, in order to rely on an unpublished decision in advocating against an opponent in the immigration courts, § 552(a)(2) itself requires the government to provide a copy of *that decision* to the opposing party. But that "remedy" does not achieve parity between the parties. If that were the only available remedy for a failure to publish all non-precedential decisions, lawyers representing the government could review the range of unpublished decisions and select those most helpful to their position for

presentation to the immigration courts, while their opponents are blocked from doing the same.

Nor does the "non-precedential" nature of the "unpublished" opinions render them irrelevant. Every lawyer knows that the ability to cite non-binding authority can be helpful. Such decisions can illustrate concrete examples of a rule's application, show that impartial judges have adopted reasoning similar to that being advanced by the advocate, or demonstrate the continuing validity of an old case. It is one thing to cite a binding precedent for a general proposition and argue to the court that the logic of the general proposition applies to the specific case before the court; it is quite another, and more persuasive, to be able to cite specific instances in which courts have in fact applied the general principle to cases closely resembling the instant case.[26] If that were not so, parties would never cite district court or out-of-circuit appellate authority to a court of appeals.

The BIA asks us to construe FOIA's remedial provision narrowly. The fact that the BIA's narrow construction appears generally inconsistent with FOIA's purpose of opening government actions to public scrutiny is not itself controlling;

---

[26] It is clear that such citations can be persuasive in immigration proceedings. *See* note 8 *supra*.

no legislation pursues its general purpose to the furthest extreme, without consideration of opposing interests. But here the narrow construction for which the BIA argues is inconsistent with the specific requirement that Congress enacted, after weighing the interest in open government against other competing values. In enacting § 552(a)(2), Congress specifically directed that the BIA, like other agencies, "make available for public inspection . . . final opinions . . . [and] orders, made in the adjudication of cases." In amending FOIA in 1974, Congress made clear that the courts had the authority to enforce that provision. The BIA's arguments urge us to limit that enforcement to a remedy that does not in fact require the agency to do what Congress wanted – to make a record of agency adjudications available to the general public by general publication. Instead, the BIA would have such records be made available only to those individual members of the public who have the resources to seek them out.[27] In effect, the

_____

[27] Such a "remedy" would replace Congress's command that the government make certain material generally available with a command that, in response to a lawsuit, the agency provide copies of that material to an individual litigant, which could then (if it were sufficiently public spirited) bear the expense of maintaining a public repository that FOIA would have borne by the government, or (if it were not) either hoard the information for its sole use, or make it available to a broader audience for commercial gain. That kind of remedy would be antithetical to the freedom of information that Congress sought in requiring publication.

BIA asks us to adopt a position that would ensure that the BIA "would have no enforceable duty to post . . . its final opinions in agency adjudication." *ALDF*, 935 F.3d at 875. While Congress does not pursue a unitary purpose to the exclusion of all other interests, the BIA (supported by the dissent) urges us to limit the judicial review that Congress provided for the enforcement of a specific obligation Congress imposed on it, by limiting the relief in a manner inconsistent with that specific obligation, without suggesting any plausible countervailing interest that would warrant such a limitation. And it would have us do so based on the less persuasive reading of the statutory text. We decline to do so.

### III.    Remaining Issues

For all of the forgoing reasons, we conclude that the remedial provision of FOIA, § 552(a)(4)(B), grants district courts the authority to order injunctive relief to enforce § 552(a)(2), including an order requiring the agency to make records available for public inspection in an electronic reading room. We note, however, that that conclusion does not end the litigation.

The BIA's motion for summary judgment argued that its non-precedential orders are outside the coverage of § 552(a)(2), and that NYLAG's request is unduly burdensome. Because the district court held that it lacked jurisdiction to

43

issue NYLAG's requested relief, it did not consider either of these arguments. J.A. 62-63. However, the breadth of NYLAG's request appears to have factored into the district court's jurisdictional holding; the court found "no authority" for the "exceedingly broad relief" NYLAG sought. J.A. 62.

NYLAG seeks the public production of every unpublished BIA opinion dating back to November 1, 1996, during which time the BIA issued more than 750,000 such opinions, a majority of which are said to contain confidential information that must be redacted prior to public disclosure. J.A. 24-25, 27-28. According to the BIA, it would take four employees working full-time nearly seven years to prepare these opinions for publication. J.A. 30.

The breadth of NYLAG's request and the district court's authority to issue relief are distinct questions that should be analyzed separately. When responding to a FOIA request made under § 552(a)(3), "an agency need not conduct a search that plainly is unduly burdensome," *Halpern v. F.B.I.*, 181 F.3d 279, 288 (2d Cir. 1999), nor need it fully comply a request that "impose[s] an unreasonable burden upon the agency," such as one that "require[s] the agency to locate, review, redact, and arrange for inspection a vast quantity of material," *Am. Fed'n of Gov't*

*Emps., Loc. 2782 v. U.S. Dep't of Com.*, 907 F.2d 203, 209 (D.C. Cir. 1990).[28] And the general rule is that injunctive relief under § 552(a)(2) should be "'no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994), quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

A district court granting relief under § 552(a)(4)(B) should therefore craft remedies that take into account the potentially significant burden on the agency of complying with any such order, and work with the parties to establish realistic timelines for compliance. The burden of producing an electronic archive of nearly a quarter-century of past decisions – albeit a problem of the BIA's own making by its failure to comply with its obligations under FOIA – is far more daunting than the burden of remedying that failure going forward. Moreover, we note that the BIA apparently has begun a process that would facilitate publication of its more recent unpublished decisions. Whatever period may be specified by the district court, it would likely make sense to begin with an order requiring compliance

---

[28] NYLAG argued below that the "'undue burden' analysis . . . is inapplicable to an agency's mandatory obligation to post records publicly under § 552(a)(2)." D. Ct. Dkt. 30 at 18. The district court did not reach this question and we take no position on it here.

going forward, and work backward from the present in setting a timetable for making older decisions available. It may be that at some point in the process, the burden of redacting and posting will outweigh the equitable benefits of continued publication. NYLAG's stated need for non-precedential opinions is to serve clients in ongoing and future litigation. Obviously, recent BIA decisions will typically be of more use to counsel than older ones. Recent decisions are more likely to address current issues, and may summarize the results of earlier cases, while older cases are more likely to deal with issues that have since been settled in precedential opinions of the BIA or the circuit courts. An order requiring the BIA to post a smaller subset of its unpublished decisions could therefore very well "provide complete relief" to NYLAG. *See Madsen*, 512 U.S. at 765.

That said, such considerations are the stuff of decisions about the scope of equitable relief, and rest in the sound discretion of the district court if, in the end, relief of any sort is ordered.

## CONCLUSION

For the reasons stated above, the judgment of the district court is VACATED, and the matter is REMANDED for further proceedings consistent with this opinion.

PARK, *Circuit Judge*, dissenting:

The Freedom of Information Act's judicial-review provision grants courts the authority "to enjoin [an] agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). Courts have long understood this provision to mean that when an agency improperly fails to produce records, courts may order the production of those records to the requester.

Today, however, the majority discovers a new judicial remedy in FOIA's review provision, requiring not just production to the requester, but publication to agency websites. To arrive at its conclusion, the majority invokes the traditional tools of statutory interpretation—textual "parsing," structural analysis, and statutory history. But the majority's approach reads a single phrase expansively ("to enjoin [an] agency from withholding agency records"), which ultimately divorces it from what I think is a more straightforward understanding of the text, structure, and history of the statute.

First, the text of the review provision's two phrases should be read together, as mutually reinforcing, rather than as separate and independent grants of authority. Specifically, the provision permits courts to order agencies to stop

withholding records and to produce them to complainants. In other words, the second phrase (requiring production to the complainant) specifies and complements the first (enjoining withholding). While this reading contains some redundancy, it gives effect to all parts of the provision. In contrast, the majority's novel interpretation treats the two as distinct remedial powers and allows the first phrase to swallow the second.

The statutory structure also makes clear that the complainant, and not the general public, is the intended beneficiary of FOIA's judicial remedies. That is why the judicial-review provision allows courts to remedy informational injuries to particular requesters, not to enforce general agency compliance with the statute. The majority's approach, however, reads into the review provision a new form of relief that expands courts' remedial power beyond the parties before them.

Finally, the statutory history highlights that Congress did not put the majority's remedy into the text of FOIA in 1966 or create it merely by reorganizing the statute in 1974. And no appellate court found otherwise for 45 years.

For these reasons, I would join the D.C. Circuit in holding that the only relief available under FOIA's judicial-review provision is the production of agency records to the plaintiff. I respectfully dissent.

# I. BACKGROUND

FOIA provides that government agencies "shall make available to the public" information falling into three categories. 5 U.S.C. § 552(a). First, agencies must publish certain records in the Federal Register, including agency rules and procedures. *Id.* § 552(a)(1). Second, agencies must make other specified records, including "final opinions" and "orders" that are "made in the adjudication of cases," "available for public inspection in an electronic format." *Id.* § 552(a)(2). Third, for remaining agency records not otherwise exempt from disclosure, the statute requires that "upon any request" that "reasonably describes such records" and "is made in accordance with published rules," the agency "shall make the records promptly available to any person." *Id.* § 552(a)(3)(A).

FOIA includes detailed procedures that agencies must follow in responding to "request[s] for records made under" the three disclosure provisions, including time limits and a right of administrative appeal. *Id.* § 552(a)(6). After exhausting administrative remedies, a requester denied access to records may seek relief in court under FOIA's private right of action, which provides:

> On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding

3

agency records and to order the production of any agency records improperly withheld from the complainant.

*Id.* § 552(a)(4)(B).

In 1974, Congress amended FOIA to move the judicial-review provision from subsection (a)(3) to (a)(4). Act of Nov. 21, 1974, Pub. L. No. 93-502, 88 Stat. 1561. This was a reorganization, not a substantive alteration, and the provision's operative language has remained unchanged since FOIA's passage in 1966.

Here, NYLAG does not seek the well-established remedy for violations of FOIA's disclosure obligations—an injunction requiring an agency to produce described records to the requester. Indeed, NYLAG expressly *disclaims* that remedy, seeking instead a court order forcing the agency to post a searchable database of records to its website. App'x at 12–13 (NYLAG's complaint, explaining that its "request was for the electronic public posting of unpublished BIA decisions . . . , not for the production of unpublished BIA decisions to NYLAG"). As the majority notes, the scope of NYLAG's request is staggering, covering hundreds of thousands of non-precedential BIA opinions totaling more than a million pages; the BIA estimates that compliance with the request would take four full-time workers nearly seven years just to apply redactions to the requested records. *See* App'x at 28–31.

## II. DISCUSSION

A. <u>FOIA Does Not Authorize the Relief NYLAG Seeks</u>

1. *Statutory Text*

The majority discovers a new publication remedy in FOIA's judicial-review provision, which gives courts "jurisdiction to enjoin [an] agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). To reach this result, the majority adopts a strained interpretation of the statutory text, which is more naturally read to limit courts' remedial authority to ordering the production of records to requesters.

First, the two phrases of the judicial-review provision should be read together as two aspects of the same remedy: (1) an order to stop withholding, and (2) a requirement to produce the materials withheld. Although they are redundant, they are reinforcing. "Sometimes the better overall reading of the statute contains some redundancy," *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019), and Congress commonly "employ[s] a belt and suspenders approach," *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1350 n.5 (2020). That is precisely what Congress did with FOIA's review provision. The second part of

the provision clarifies the first, giving courts explicit guidance about the specific form the remedy should take. Put differently, the first phrase is a negative command ("to enjoin . . . from withholding"), and the second is a positive one ("to order the production") that explains how to accomplish the former.

According to the majority, the interpretations offered by the parties each render one part of the review provision superfluous, so the arguments "cancel each other out." Maj. Op. at 26. But that approach overlooks what is lost in each side's interpretation. Under the BIA's reading, the phrases are redundant but reinforce Congress's intent by removing doubt. Under NYLAG and the majority's reading, however, the first phrase swallows the second; if authority "to enjoin the agency from withholding records" means courts may require agencies to make records available in any number of ways, Congress had no reason to also give courts the authority "to order the production" of such records to "the complainant." The two interpretations are thus not equally superfluous. The better reading is the agency's, which uses redundancy to reinforce meaning, and not the majority's, which renders one phrase entirely meaningless.

Second, stating that courts have "jurisdiction to enjoin the agency from withholding agency records" would be an odd way for Congress to grant courts

6

authority to enforce compliance with the reading-room requirement of subsection (a)(2). In fact, the use of the negative framing coupled with the positive remedy of production to the complainant is another point in favor of the agency's interpretation: The two parts are complementary, with the first emphasizing the prohibited conduct and the second clarifying the form of relief. If Congress wanted to create a new, separate equitable power to order publication of records, it could have been more explicit—as indeed it was when specifying that courts could order the "production of any agency records improperly withheld."

Third, the majority's reading unnaturally segregates the two parts of the judicial-review provision. The majority declines to limit subsection (a)(4)(B) to "withholding . . . from the complainant" based on the absence of a comma that would have made clearer that "from the complainant" applies to both parts of the subsection. Maj. Op. at 25–26. This focus on punctuation misses the forest for the trees. The majority pairs the first part of subsection (a)(4)(B) with subsections (a)(1) and (a)(2) to create a private right of action by any complainant to order production online on behalf of the public. But it limits the second half of subsection (a)(4)(B) to improper withholding from individual complainants under subsection (a)(3). I would not extract so much meaning from a missing comma.

7

To the contrary, Congress used the word "withhold" twice, and a natural reading would give it the same indirect object (the "complainant") both times. *See Paroline v. United States*, 572 U.S. 434, 447 (2014) ("When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." (citation omitted)). After noting that courts have the power "to enjoin [an] agency from withholding agency records," the review provision directs courts "to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). Both phrases refer to agency "withholding" of records, a usage that suggests the party from which the records have been withheld is a particular requester. Indeed, the statute elsewhere differentiates between "withholding" records and failing to make them publicly available. *See id.* § 552(d) (FOIA "does not authorize withholding of information *or* limit the availability of records to the public, except as specifically stated" in the statute (emphasis added)). "A term appearing in several places in a statutory text

8

is generally read the same way each time it appears." *Milner v. Dep't of Navy*, 562 U.S. 562, 570 (2011) (citation omitted).[1]

As the majority concedes, its decision is in conflict with the D.C. Circuit's holding in *Citizens for Responsibility & Ethics in Washington v. United States Department of Justice* ("*CREW I*"), 846 F.3d 1235 (D.C. Cir. 2017), that the only remedy available through FOIA's judicial-review provision is the production of records to the requester. *CREW I* was consistent with the statutory text, and I would follow the D.C. Circuit's approach. *See Whitaker v. Dep't of Com.*, 970 F.3d 200, 206 (2d Cir. 2020) (noting the D.C. Circuit's "particular FOIA expertise").

The majority finds *CREW I* unpersuasive because the D.C. Circuit "spent little time parsing the text of the statute." Maj. Op. at 16. But in *CREW I*, the D.C. Circuit relied on its prior decision in *Kennecott Utah Copper Corp. v. United States Department of Interior*, 88 F.3d 1191 (D.C. Cir. 1996), which did engage in such an analysis. *See CREW I*, 846 F.3d at 1243; *Kennecott*, 88 F.3d at 1202–03. The majority casts this reliance as a deficiency, dismissing *CREW I* on the ground that the D.C.

---

[1] Similarly, only the second phrase describes "improper" withholding, while the first is silent about what kind of withholding courts may enjoin. Of course, FOIA permits agencies to withhold certain records. *See* 5 U.S.C. § 552(b) (setting out exemptions from disclosure). The second phrase thus explains the type of withholding that may be enjoined and specifies the remedy for such improper withholding—production to the complainant. The point is that these phrases are not two separate authorizations; they are best read together.

9

Circuit was bound by its prior decision in *Kennecott*. Maj. Op. at 17. But the majority hardly grapples with *Kennecott*, which considered the text of the statutory disclosure provision (in that case, subsection (a)(1)) *and* the judicial-review provision. *See Kennecott*, 88 F.3d at 1203. In other words, the majority faults *CREW I* for inadequate textual parsing and for relying on another case, when that other case did that textual parsing.[2]

In *Kennecott*, the D.C. Circuit carefully analyzed the statutory text and concluded that Congress did not intend the term "production" to include "publication." 88 F.3d at 1203. It correctly noted that, although Congress required agencies to publish documents in subsection (a)(1), that requirement does not necessarily mean that Congress also gave courts the authority to order compliance. *Id.* at 1202–03 ("While it might seem strange for Congress to command agencies to 'currently publish' or 'promptly publish' documents, without in the same statute

---

[2] The majority also suggests that the D.C. Circuit has since disavowed the holding of *CREW I* because, in a later opinion, it "construed *CREW I* narrowly as turning on the fact that the plaintiff 'improperly brought its claim under the Administrative Procedure Act, 5 U.S.C. § 704, instead of FOIA's judicial-review provision.'" Maj. Op. at 18 (quoting *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice* ("*CREW II*"), 922 F.3d 480, 485 (D.C. Cir. 2019)). But *CREW II* does not cite *CREW I* in its analysis; the quoted statement comes from the background description of why the *district court* dismissed the complaint in *CREW I*. *See CREW II*, 922 F.3d at 485. There is thus no basis for the majority's reading of *CREW II* as an expression of "reservations about [*CREW I*'s] interpretation of the remedial provision." Maj. Op. at 17.

providing courts with power to order publication, we think that is exactly what Congress intended.").  I would take the same approach.

2.     *Statutory Structure*

Congress did not include in FOIA the enforcement authority the majority divines from the review provision.  That omission makes sense in light of the three ways Congress did provide for courts to address agency non-compliance with FOIA's disclosure obligations:  Courts may (1) require the production of records to a particular complainant, (2) refer matters to the Office of Special Counsel for further investigation, and (3) prohibit agency reliance on undisclosed records.  Each of these mechanisms is consistent with the *individual* nature of the judicially enforceable rights asserted by FOIA plaintiffs.  *See Kennecott*, 88 F.3d at 1203 (holding that FOIA's judicial-review provision "is aimed at relieving the injury suffered by [an] individual complainant, not by the general public").

First, production to the complainant redresses the informational injury FOIA's judicial-review provision was enacted to protect.  This objective can be seen most clearly in the provision's interaction with FOIA's overall request procedure. All FOIA claims begin with a "request to [an] agency for records under paragraph (1), (2), or (3)"—*i.e.*, records arguably covered by FOIA's three

11

disclosure categories. 5 U.S.C. § 552(a)(6)(C)(i). If an agency determines that it will "comply with" a request, it must make the records "promptly available to such person making such request." *Id.* The statute thus contemplates that a successful FOIA request will result in production *to an individual requester*. It follows that the judicial-review provision—which is relevant only if an agency *fails* to comply with a request—should offer the same relief. The majority's reading, however, would order disclosure not only to the complainant but also to the general public. This interpretation is inconsistent with the statutory structure because it disconnects the review provision from the request procedure.

Second, Congress included in FOIA a Special Counsel provision triggered by harms to individual requesters, not the general public. Courts may refer matters involving improper withholding to the Office of Special Counsel only when they "order[] the production of any agency records improperly withheld *from the complainant*." *Id.* § 552(a)(4)(F)(i) (emphasis added). This is a puzzling limitation if, as the majority holds, the judicial-review provision also authorizes courts to order agencies to publish records on the internet for the benefit of the public at large. Under a commonsense reading of the review provision, however,

12

courts are limited to providing remedies to the plaintiffs before them, so Congress had no need to extend courts' referral authority to other contexts.

Third, Congress imposed a judicially enforceable sanction for agency failures to publish records as required, thus furthering the reading-room provision's objective of protecting individuals from "secret law." Records that must be made available to the public under subsection (a)(2) "may be relied on, used, or cited as precedent by an agency against a party other than an agency only if" they are published electronically or "the party has actual and timely notice of the terms thereof." *Id.* § 552(a)(2). This prohibition and the corresponding prohibition on the use of unpublished records in subsection (a)(1) give agencies a "powerful incentive" to comply with their affirmative disclosure obligations. *Kennecott*, 88 F.3d at 1203. And if an agency fails to publish records as required, plaintiffs can seek relief in court. *See, e.g.*, *N. Cal. Power Agency v. Morton*, 396 F. Supp. 1187, 1191, 1195 (D.D.C. 1975) (setting aside agency action based on unpublished rules of which the plaintiff had no notice), *aff'd sub nom. N. Cal. Power Agency v. Kleppe*, 539 F.2d 243 (D.C. Cir. 1976). The majority is thus incorrect to assert that a limited reading of FOIA's judicial-review provision "render[s] the proactive disclosure requirements . . . merely precatory." Maj. Op. at 33.

The majority argues that the prohibition on using unpublished records does not prevent agencies from engaging in gamesmanship by selectively releasing records. *Id.* at 34. As proof, the majority cites a handful of instances in which the BIA has cited unpublished decisions. *Id.* at 9 nn.7-8. Such a sampling provides little empirical insight into the scope of the asserted problem. But even assuming for the sake of argument that the majority is correct, the efficacy of the enforcement mechanism does not bear on the question of statutory interpretation. *See Nw. Airlines, Inc. v. Transp. Workers Union*, 451 U.S. 77, 97 (1981) ("[T]he authority to construe a statute is fundamentally different from the authority to fashion a new rule or to provide a new remedy which Congress has decided not to adopt.").

3. *Statutory History*

As part of its reorganization of FOIA in 1974, Congress moved the judicial-review provision from subsection (a)(3) to a separate subsection, (a)(4)(B). The majority states that this change reflected Congress's intent "to make clear that judicial review is available when an agency fails to comply with *any* provision of § 552(a)." Maj. Op. at 38. Asserting that judicial review was always available for failures to produce records under subsections (a)(1) and (a)(2), the majority reasons that the amendment must have done something more, and concludes it

14

granted "district courts the authority to order agencies to make documents available for public inspection." *Id.* at 38–40.

This reads too much into the statutory history. Providing for judicial review is not the same as expanding the scope of courts' remedial authority, and the majority points to nothing else supporting its inferential leap. Indeed, the Senate report on which the majority relies states that the amendment was intended to clarify, rather than change, the scope of the judicial-review provision.[3] *See* S. Rep. No. 93-854, at 8–9 (1974) (explaining that the amendment was intended to "lay . . . to rest" any misconception that "judicial review of a denial of information requested under subsections (a)(1) and (a)(2) was not available under the FOIA").

If Congress had intended in 1974 to grant courts new authority to enforce compliance with subsections (a)(1) and (a)(2), it could have changed the provision's operative language to grant that power explicitly. For example, it could have authorized courts "to enjoin the agency from withholding agency records *and to order compliance with respect to subsections (a)(1) and (a)(2)*, and to

---

[3] The 1974 reorganization clarified that judicial review is available for requests for records described in each of FOIA's three disclosure categories, addressing the view of some agencies that judicial review covered only requests for records described in subsection (a)(3). *See* S. Rep. No. 93-854, at 8 (1974) (noting that "[o]n occasion" the Department of Justice had taken that position in litigation).

order the production of any agency records improperly withheld from the complainant *with respect to subsection (a)(3).*" But Congress did not do that, and the 1974 amendment did not change a word of the judicial-review provision. Instead, it simply moved the provision to a new subsection, making clear that judicial review is available for denials of requests for records described in each of FOIA's disclosure categories. That reorganization cannot reasonably be read as creating a new *remedy* for such violations.

Finally, for 45 years, no appellate court held that the 1974 amendment did what the majority says it did. The Ninth Circuit in 2019 was the first to find that Congress had given courts the equitable authority to order compliance with subsections (a)(1) and (a)(2) back in 1974. *See Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 935 F.3d 858 (9th Cir. 2019). This suggests that the majority's statutory interpretation is not only novel, but contrary to FOIA's history.

B.      Additional Relief Is Not Available Under the APA

NYLAG argues that even if it could not obtain injunctive relief through FOIA, it could still do so through 5 U.S.C. § 704, the Administrative Procedure Act's general review provision. The majority did not need to reach this question, and I note only briefly that the APA would not separately provide the relief

16

NYLAG seeks. "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," and the APA thus "does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (cleaned up). Plaintiffs cannot obtain relief under § 704 where a statutory review provision allows courts to grant remedies of the "same genre," *see, e.g.*, *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009), or permits *de novo* review of agency action in federal district court, *see, e.g.*, *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005).

FOIA's judicial-review provision meets both standards. Plaintiffs dissatisfied with an agency's response to a FOIA request can seek plenary review in an Article III court with equitable authority to compel production of agency records. *See* 5 U.S.C. § 552(a)(4)(B) ("[T]he court shall determine the matter de novo . . . ."). And the remedy of direct production to NYLAG is of the "same genre" as online publication by the BIA, because it would fully resolve any informational injury caused by NYLAG's inability to access agency records. There is thus "no yawning gap between the relief FOIA affords and the relief [NYLAG]

17

seeks under the APA"—although "courts lack authority under FOIA to order agencies to make records available for public inspection," NYLAG itself can still "gain access to all the records it seeks." *CREW I*, 846 F.3d at 1246 (cleaned up). Moreover, "[t]he creation of both agency obligations and a mechanism for judicial enforcement in the same legislation suggests that FOIA itself strikes the balance between statutory duties and judicial enforcement that Congress desired." *Id.* at 1245. Direct production of records under FOIA's judicial-review provision is the sole form of relief available to NYLAG.

## III.   CONCLUSION

The majority today finds in FOIA's judicial-review provision an authority that is (1) not stated expressly in the statutory text, (2) inconsistent with the statutory structure, and (3) unsupported by the statutory history. By following the Ninth Circuit's decision in *Animal Legal Defense Fund* instead of the D.C. Circuit's decisions in *CREW I* and *Kennecott*, the majority joins the wrong side of a circuit split that the Supreme Court will need to resolve. FOIA plaintiffs can now sue in New York and California (avoiding D.C. Circuit precedent) to compel agency action in Washington, D.C. This state of affairs makes little sense.

For these reasons, I respectfully dissent.

18